UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, ) ) ) | |
| Plaintiff, ) ) | |
| v. ) ) | Civ. Action No. 07-0048 (RBW) |
| NATIONAL ARCHIVES AND RECORDS ADMINISTRATION, ) ) ) ) | |
| Defendant. ) ) | |

### SUPPLEMENTAL DECLARATION OF GARY M. STERN

I, Gary M. Stern, hereby declare:

1. In my original Declaration, dated May 7, 2007, I set out NARA's bases in support of withholding the documents listed on the *Vaughn* index under Exemption 5 of the Freedom of Information Act (FOIA), 5 U.S.C. 552(b)(5). I have read Plaintiff's Opposition to Defendant's Motion for Summary Judgment and Memorandum in Support of Plaintiff's Cross-Motion for Summary Judgment, and wish to respond to supplement the record by making the following additional points.

*NARA's Authority Under The Records Laws*

2. Congress has charged the Archivist of the United States ("Archivist"), and the National Archives and Records Administration ("NARA"), with several principal roles and responsibilities under the statutes collectively referred to as the Federal Records Act ("FRA").

Under Chapter 29 of Title 44, United States Code, NARA provides "guidance and assistance to Federal agencies with respect to ensuring adequate and proper documentation of the policies and transactions of the Federal Government and ensuring proper records disposition." 44 U.S.C. § 2904(a). NARA also "shall establish standards for the selective retention of records of continuing value, and assist Federal agencies in applying the standards to records in their custody." 44 U.S.C. § 2905(a). These standards are found in regulations issued by NARA in chapter XII of Title 36, Code of Federal Regulations, in NARA bulletins issued to agency heads and records officers, and in policy papers and directives circulated by NARA, including on its website.

    3. Under Chapter 33 of Title 44, United States Code, the Archivist of the United States is also personally responsible for authorizing federal agencies to dispose of non-permanent federal records. This authorization is established through the process of scheduling federal records. 44 U.S.C. § 3303a. NARA archivists and attorneys assist agencies during the deliberative process of developing records schedules, but only the Archivist of the United States exercises the authority under 44 U.S.C. § 3303a to give final approval to records schedules on the government's behalf.

    4. Under Chapter 31 of Title 44, United States Code, the head of each federal agency is responsible for "mak[ing] and preserv[ing] records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency and designed to furnish the information necessary to protect the legal and financial rights of the Government and of persons directly affected by the agency's

2

activities." 44 U.S.C. § 3101. The agency head is also responsible for establishing and maintaining "an active, continuing program for the economical and efficient management of the records of the agency." 44 U.S.C. § 3102. Such responsibilities necessarily entail determining whether or not particular materials meet the definition of what constitutes a federal "record," as set out in 44 U.S.C. § 3301. In turn, NARA is continually called upon to provide advice and recommendations on what constitute best practices in this area.

5. Under the separate provisions of the Presidential Records Act ("PRA"), Chapter 22 of Title 44, United States Code, the President is responsible for the records management of Presidential records, 44 U.S.C. § 2203(a), which includes determining whether or not particular records meet the definition of "presidential records" found in 44 U.S.C. § 2201(2). Although the President is required to seek the Archivist's views on any contemplated disposal of an incumbent Administration's presidential records, *see* 44 U.S.C. 2203(c), NARA has no formal role on the threshold question of whether particular documents or information do or do not constitute "presidential records" as defined under the PRA.

6. As I alluded to in ¶ 14 of my original Declaration, dated May 7, 2007, NARA archivists and attorneys are routinely consulted by federal agencies for advice and recommendations in support of an agency's records management activities, and from time to time we are also consulted by the White House in connection with providing best practices guidance on the management of presidential records. NARA considers all of these consultations part of the deliberative process for carrying out the government's overall records management responsibilities. NARA attorneys are also routinely consulted by the Department of Justice and

3

agency legal counsel when issues arise under the FRA, the PRA, or both. In particular, the advice, guidance, and recommendations that NARA's attorney staff (including myself) provide also are very much part of the deliberative process for carrying out the government's records management responsibilities, often at the intersection of law and policy.

7. The 37 documents now remaining in this case reflect the ongoing deliberations on a complicated and unusual records situation that has been of continuing interest to NARA over the course of the last decade. Contrary to what plaintiff represents throughout its Opposition and Cross Motion brief, the communications contained in the withheld documents do not constitute "legal conclusions" exercised under NARA's "statutory authority" as the "final arbiter" of records disputes. Other than the statutory responsibility the Archivist has to issue regulations and to make a final decision on the permanent or temporary status of federal records in accordance with 44 U.S.C. § 3303a, the Federal Records Act, as noted in ¶ 4, above, expressly leaves to the head of each Federal agency the duty to establish and maintain records management programs. *Id.* § 3102. Subordinate officials of NARA (including myself) simply attempt to provide our best advice and recommendations with respect to how agencies should comply with their responsibilities under the Act. Thus, plaintiff's argument (at page 11 of their Brief and elsewhere) incorrectly merges the Archivist's authority over the disposition of federal records with NARA staff's general legal and policy advice-giving responsibilities. The fact that there has been a fair amount of intra- and inter-agency discussions involving NARA on the issues surrounding the management of the copy of the White House access records in the possession of the Secret Service – which under the MOU, the Secret Service will temporarily maintain until the

records are transferred to the White House Office of Records Management and then to NARA for permanent preservation – is to be expected, as reflected in many of the documents singled out by plaintiff in its Brief (including, but not limited to, documents 3, 5, 7, 12, 13, 17, and 26).

8. Plaintiff also specifically refers to document 14 as representing "NARA's discharge of its statutory duty to act on agency proposals regarding the disposition of its records." Document 14 consists of a memorandum I penned titled "Disposition of Certain Presidential Records Created by the USSS," dated January 19, 2001 (the last day of the Clinton Administration). As I discussed in my prior Declaration at ¶ 18, this document, constituting a one page "Memorandum" on NARA letterhead, reflected my then understanding of how WAVES and related records would be treated under the records laws, and how NARA intended to proceed in working in the future toward implementing the recommendations contained in Document 13 coming from the White House and U.S. Secret Service. Against the backdrop of the change in Administration coming the day after I signed the memorandum, it turned out that the recommendations contained in Document 13, which I concurred with in Document 14, were not implemented in that form either by the Secret Service or by the Archivist of the United States as the final decisionmaker for NARA. Nor was Document 14 binding on anyone or self-executing in any sense. Rather, the entire matter of the status and handling of the copy of WAVES and related records in the possession of the Secret Service was revisited during the current Administration and, after a passage of time, the White House and the Secret Service in 2006 entered into the now-public Memorandum of Understanding setting forth the government's official position. I continue to believe that, in light of all of the surrounding developments that

have occurred with respect to WAVES and related records, this document should be considered deliberative and pre-decisional when viewed in its proper context.

*Attorney Work-Product Doctrine*

9. CREW has challenged NARA's claim that the attorney work-product doctrine protects documents dating back to March 2000, *see, e.g., Vaughn* Index # 5, and has alleged that NARA failed to identify a single FOIA request for WAVES records prior to January 2006. It was my understanding in March 2000, based upon information made available to me in my capacity as NARA General Counsel, that the Secret Service had previously received FOIA requests for White House access records at that time. It is my further understanding that the Secret Service has received similar FOIA requests since that time period as well.

*Adequacy of NARA's Search for Responsive Records*

10. Plaintiff makes the additional argument that NARA has not carried its burden in establishing that we conducted an adequate search for responsive records. Specifically, plaintiff has asked (at page 25 of their Opposition and Cross Motion) that NARA identify "which specific files were searched using specific search terms." NARA's FOIA search for responsive records in this case was conducted in exactly the same manner as most FOIA requests are handled: upon receipt of the original request, our FOIA officer, Ramona Oliver, who works under my general supervision, contacted the key agency offices and officials that were believed to have responsive records and provided them with a copy of the request. In this instance, it was quickly determined

that key staff in three offices would most likely be in possession of any responsive records: the General Counsel's office, the Office of Records Services—Washington, D.C., located in College Park, Maryland, and the Office of Presidential Libraries, in Washington, D.C. One or more key individuals were tasked by the FOIA officer to review their paper and electronic files for any and all responsive records related to the six categories set out in CREW's original FOIA request. The search included records located in the official job files associated with Secret Service records retention schedules, as well as in staff members' working papers found in each of the above offices. Individuals searched their own electronic mail accounts, as well as looked for email that had been printed out and saved in files in accordance with NARA official policy. To the extent electronic searches were conducted in applicable email and word processing folders and directories, there was no need to resort to specific "search terms," as each individual was sufficiently familiar with the organization of his or her own directory structure so as to conduct an exhaustive search. During the administrative FOIA appeal, NARA staff in the Office of General Counsel and the Office of Presidential Libraries recovered an additional 50 documents from their working files. Accordingly, we believe that the files on this discrete topic that are likely to contain responsive records have been made subject to an adequate search.

    I declare under penalty of perjury that the foregoing is true and correct.

                                    GARY M. STERN

Date: June 21, 2007