# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) ) |
| NATIONAL ARCHIVES AND RECORDS ADMINISTRATION | ) ) ) |
| Defendant. | ) ) ) |

Civil Action No. 07-0048 (RBW)

## DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

PETER D. KEISLER
Assistant Attorney General

CARL J. NICHOLS
Deputy Assistant Attorney General

JEFFERY A. TAYLOR
United States Attorney

ELIZABETH J. SHAPIRO (D.C. Bar 418925)
Assistant Branch Director

*Of Counsel*:
JASON R. BARON (D.C. Bar. 366663)
Director of Litigation
Office of the General Counsel
National Archives and Records
Administration
8601 Adelphi Road, Suite 3110
College Park, MD 20740

JOHN R. TYLER (D.C. Bar 297713)
Senior Trial Counsel
MICHAEL P. ABATE (IL Bar 6285597)
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W., Room 7302
Washington, D.C. 20001

*Attorneys for Defendant*

## TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    I.    Nara Validly Withheld Documents Pursuant to Exemption 5 . . . . . . . . . . . . . . . 5

        A.    Inter-Agency Deliberations on Disposition of
            WAVES Records . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

            1.    Deliberations on the Proposed WAVES
                 Records Schedules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

            2.    Deliberations on 2001 WAVES Retention
                 Memorandum . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

            3.    Deliberations on 2004 WAVES Retention
                 Memorandum . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

            4.    USSS Presentation to NARA and Other Officials . . . . . . . . . . . 16

        B.    Documents Related to the Pending *Judicial
            Watch* Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        C.    Deliberations on Status and Disposition of WAVES
            Records Contemporaneous With Ongoing Litigation . . . . . . . . . . . . . . 19

            1.    Draft of the Memorandum of Understanding . . . . . . . . . . . . . . 19

            2.    Nonpublic Advice Memorandum From DOJ's
                 Office of Legal Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

            3.    Inter- and Intra-Agency Communications About
                 Drafts of the MOU and OLC Advice Memorandum . . . . . . . . . 23

            4.    Inter-Agency Deliberations About the Transfer
                 and Retention of WAVES and ACR Records in
                 Light of Pending Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    II.    NARA Conducted an Adequate Search . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## TABLE OF AUTHORITIES

**CASES**                                                                **PAGES**

Access Reports v. Dep't of Justice, 926 F.2d 1192 (D.C. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . .  9

American Civil Liberties Union v. Department of Justice,
    883 F. Supp. 399 (S.D.N.Y. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8, 19

Armstong v. Bush, 924 F.2d 282 (D.C. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

Badhwar v. U.S. Dep't of Air Force, 622 F. Supp. 1364
    (D.D.C. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Brinton v. Department of State, 636 F.2d 600 (D.C. Cir. 1980) . . . . . . . . . . . . . . . . . . . . . .  21

* Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854
    (D.C. Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Dudman Communications Corp. v. Dep't of the Air Force, 815 F.2d
    1565 (D.C. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 22

Evans v. U.S. Office of Pers. Mgmt., 276 F. Supp.2d 34 (D.D.C. 2003) . . . . . . . . . . . . . . . . . 7

Ground Saucer Watch v. CIA, 692 F.2d 770 (D.C. Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . .  24

Hertzberg v. Veneman, 273 F. Supp. 2d 67 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

Int'l Paper Co. v. Fed. Power Comm'n, 438 F.2d 1349 (2d Cir. 1971) . . . . . . . . . . . . . . . . . .  22

Judicial Watch, Inc. v. Clinton, 880 F. Supp. 1 (D.D.C. 1995) . . . . . . . . . . . . . . . . . . . . . passim

Judicial Watch, Inc. v. Dep't of Justice, 432 F.3d 366 (D.C. Cir. 2005) . . . . . . . . . . . . . . . . .  17

Judicial Watch v. Export-Import Bank, 108 F. Supp. 2d 19 (D.D.C. 2000) . . . . . . . . . . . . . . . 17

* Nat'l Council of La Raza v. U.S. Dep't of Justice, 339 F. Supp. 2d 572
    (S.D.N.Y.2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20, 21

* NLRB v. Sears, Roebuck, & Co., 421 U.S. 132 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . .  8, 19

Southam News v. INS, 674 F.Supp. 881 (D.D.C. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

Tax Analysts v. I.R.S., 97 F. Supp. 2d 13 (D.D.C. 2000) . . . . . . . . . . . . . . . . . . . . . . . .  7, 15, 16

* <u>Tax Analysts v. I.R.S.</u>, 117 F.3d 607 (D.C. Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

<u>Weisberg v. Dep't of Justice</u>, 745 F.2d 1476 (D.C. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . 24

<u>Wolfe v. Dep't of Health and Human Servs.</u>, 839 F.2d 768
       (D.C. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

## <u>STATUTES</u>

44 U.S.C. § 2201(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

44 U.S.C. § 2203(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 11, 13

44 U.S.C. § 3101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

44 U.S.C. § 3102 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 11

44 U.S.C. § 3301 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

## INTRODUCTION

In filing this case, plaintiff Citizens for Responsibility and Ethics in Washington ("CREW"), described it as an action "for documents relating to a request NARA made to the United States Secret Service that it cease destruction of visitor records" after transferring them to the White House. Compl. ¶ 1. Switching gears entirely, CREW now casts this case as one about a purported "government-wide effort to prevent the public from learning the truth behind the radical shift in position on the status of White House visitor records." Plaintiff's Opposition to Defendant's Motion for Summary Judgment and Memorandum in Support of Plaintiff's Cross-Motion for Summary Judgment ("Pls. Opp.") at 11; *see also id.* at 16 (speculating that "there was disagreement within the executive branch over how to apply those [maintenance and disposition] procedures to Secret Service records of White House visitors"). This shift in the focus of the litigation reveals the true motivations behind this suit: CREW seeks records reflecting the entire course of the inter-agency deliberations in which the United States Government concluded that WAVES and related records are presidential records. The deliberative process privilege, which protects "the give-and-take of the consultative process," forbids that inquiry. *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980).

There is no doubt what the United States' position is with respect to the status of White House access records. As CREW itself notes, the United States Secret Service ("USSS") and the White House Office of Records Management ("WHORM") executed a Memorandum of Understanding ("MOU") in 2006 that memorialized and confirmed those parties' agreement about the legal status and proper handling of WAVES and related records. CREW is well aware of that MOU's statement (in paragraph 17.a.) that these records "are at all times Presidential records." Not only was this MOU made public in the *Washington Post* litigation, but an additional copy of it was

provided to CREW in *this litigation* by NARA at the time it filed its motion for summary judgment. Moreover, CREW is actively involved in litigation against NARA and the USSS in which CREW disputes that WAVES records are governed by the Presidential Records Act ("PRA"), and not the Federal Records Act ("FRA").

In light of this publicly-available MOU, CREW's repeated allegation that the documents identified in the *Vaughn* Index constitute a body of "secret law" ring hollow. In fact, the very suggestion that NARA *could* create such a body of "secret law" about the records' status under the PRA evinces a fundamental misunderstanding of NARA's legal duties and responsibilities. Contrary to CREW's suggestion, *see, e.g.*, Pls. Opp. at 11, 16, NARA (and, more specifically, NARA's General Counsel) is not the final arbiter of all record keeping issues within the federal government. To the contrary, under the FRA, NARA only possesses the authority to issue regulations for the guidance of other agencies in their management of their own record keeping programs, and to authorize the disposal of non-permanent federal records through the records "scheduling" process – and even that authority is exercised only by the Archivist himself. *See* Supplemental Declaration of NARA General Counsel Gary M. Stern ("Supp. Stern Decl.") ¶¶ 2-3. The antecedent duty to establish and maintain a records management program, and the corresponding duty to determine what constitutes a federal record, belongs to the head of each individual agency. *Id.* ¶¶ 4, 7; 44 U.S.C. §§ 3101, 3102, 3301. Similarly – and of great importance to this case – the duty to determine whether a record is presidential under the PRA belongs to the President, not NARA. *See* Supp. Stern Decl. ¶ 5; 44 U.S.C. § 2203(a). This is so because only the President (or his designee(s)) can determine whether a record was "created or received . . . in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President," as stated in 44 U.S.C. § 2201(2). Thus, NARA's participation

in deliberations about the legal status and the disposition of WAVES records was not an "exercise" of statutory duties but, instead, part of the customary practice in which NARA participates in inter-agency deliberations concerning particular record keeping proposals advanced by other federal agencies. Supp. Stern Decl. ¶ 6.

Moreover, it must be noted that in order to advance this flawed contention that NARA has created a body of "secret law," CREW goes to great lengths to portray NARA's deliberations as containing purely "legal" discussion.[1] Implicit in these characterizations of NARA's communications is the assumption that discussions of "legal," as opposed to "policy," matters are not protected by the deliberative process privilege. That assumption simply is not true. *See, e.g.*, *Wolfe v. Dep't of Health and Human Servs.*, 839 F.2d 768, 773 (D.C. Cir. 1988) ("[T]he purpose of Exemption 5 is to encourage the 'frank discussion of *legal and policy issues*.'" (quoting legislative history of the FOIA)) (emphasis added).

In addition to attacking the deliberative process rationale for NARA's withholdings, CREW also alleges that none of these documents are protected by the attorney work-product doctrine. CREW takes issue with NARA's assertion that it reasonably believed litigation over the legal status of WAVES and related records was likely because of the fact that "many parties might wish to file FOIA requests seeking to obtain records containing information on individuals who visited the White

---

[1] *See, e.g.*, Pls. Opp. at 2 ("First, NARA argues that the documents concern a policy issue . . . . In fact, however, the documents concern a legal issue."); *id.* at 9 (Document 3 "was not produced in the process of formulating policy or advice regarding WAVES records, but rather is a statement of the agency's legal position."); *id.* at 14 ("Agency recommendations to NARA on the disposition of agency records" are "legal issues" and are not "deliberative" because "[t]hey set out NARA's technical advice and legal position on the scheduling" of records); *id.* at 15 (communications "do not fall within the deliberative process privilege because they consist of the legal views of NARA's general counsel"); *id.* at 22 ("Thus, because NARA was merely articulating its legal position on record-keeping issues," the communications are not protected by exemption 5).

House," and that such requests "would involve the question of whether these records were 'federal' or 'presidential'" – an issue that could likely become (and *has become*) the subject of litigation. Declaration of NARA General Counsel Gary M. Stern ("Stern Decl.") Stern Decl. ¶ 23.[2]  CREW counters that (1) "the documents at issue here were created in 1997 and 2000," and (2) that "NARA has not identified a single FOIA request for these records prior to January 20, 2006."  Pls. Opp. at 12-13.  The implication is that NARA's communications occurred too far in advance of litigation over the status of WAVES records for NARA to have reasonably believed such litigation likely. This argument is both factually and legally flawed.

Factually, CREW errs in at least two respects.  First, they misread the *Vaughn* Index.  NARA does not claim the protection of the attorney work-product over any documents created "nine years" prior to any litigation on the issue – *i.e.*, in 1997.  *See* Pls. Opp. at 13.  In fact, the oldest document for which NARA claims the work-product privilege is an e-mail by NARA General Counsel Gary Stern dated March 3, 2000.  *See Vaughn* Index # 5.  Second, and more importantly, CREW incorrectly implied that no FOIA requests for WAVES records were made prior to January 2006. In fact, the Secret Service received multiple FOIA requests for White House access records prior to March 2000, *see* Declaration of Latita M. Huff ("Huff Decl.") ¶ 3, and NARA's General Counsel was aware of those requests, *see* Supp. Stern Decl. ¶ 9.

Moreover, CREW's argument is also legally flawed.  Litigation need not be pending – or even imminent – at the time of a document's creation for that document to be protected by the attorney work-product doctrine.  There need be only "an articulable claim, likely to lead to

_____

[2] This declaration was filed on May 7, 2007, along with Defendant's Motion for Summary Judgment and is referred to herein as "Stern Decl."  The supplemental declaration filed along with this reply brief is referred to herein as "Supp. Stern Decl."

litigation." *Coastal States Gas Corp.*, 617 F.2d at 865. "[A] party 'must at least have had a subjective belief that litigation was a real possibility, and that belief must have been objectively reasonable' in the circumstances." *Hertzberg v. Veneman*, 273 F. Supp. 2d 67, 78 (D.D.C. 2003). CREW has not challenged NARA's assertion that it subjectively believed litigation likely. *See* Stern Decl. ¶ 23. Therefore, CREW hinges its entire work-product argument on the contention that it was objectively *unreasonable* for NARA to believe that litigation over WAVES' status "was a real possibility," even though USSS had already received FOIA requests for White House access records, and NARA's General Counsel was aware of those requests. *See* Huff Decl. ¶ 3; Supp. Stern Decl. ¶ 9. As the opposite is true – that is, it was objectively *reasonable* for NARA attorneys to believe litigation over the legal status of WAVES and related records was at least "a real possibility" – CREW's argument should be rejected.

For the reasons stated herein, CREW's remaining challenges to NARA's continued withholdings of the documents contained in the *Vaughn* Index should be rejected.[3] For the Court's convenience, Defendant addresses the documents with reference to the categories set forth in the first declaration of NARA's General Counsel and in Defendant's Motion for Summary Judgment.

## ARGUMENT

### I.    NARA VALIDLY WITHHELD DOCUMENTS PURSUANT TO EXEMPTION 5

#### A.    Inter-Agency Deliberations on Disposition of WAVES Records

##### 1.    *Deliberations on the Proposed WAVES Records Schedules*

CREW continues to challenge NARA's withholding of documents that were part of the inter-

---

[3] CREW has waived its challenge to the withholdings of the following Documents: 1, 2, 4, 6, 8-11, 15a, 19-23, 25, 28, 32-33, 38-39, 41, 43, 47, 50, 52, and 61-75.  CREW continues to challenge the withholding of the remaining 37 documents identified in the *Vaughn* Index.

agency deliberations on the disposition of WAVES records. Among the group of documents CREW still seeks are NARA's internal deliberations concerning proposed WAVES records schedules submitted in 1990, 1993, and 1996 (the schedules, which were ultimately withdrawn, have been released). *See Vaughn* Index ## 3, 5, 7. These documents are validly withheld pursuant to both the deliberative process privilege and the attorney work-product doctrine.

CREW first argues that Document 3 cannot be withheld under the deliberative process privilege because it was "not produced in the process of formulating policy or advice regarding WAVES records," and was, instead, "a statement of the agency's legal position." Pls. Opp. at 9. There is no basis for this assertion: Document 3 is an unsigned, undated, single-page cover memorandum attached to a later-withdrawn draft records schedule, *see Vaughn* Index # 3. CREW does not explain how this document could possibly constitute a statement of NARA's official "legal" position with respect to the proper disposition of WAVES records.

Because there is no basis in the record for describing this internal, unsigned memorandum as an official expression of NARA's legal position, CREW attempts to bolster its argument by analogizing Document 3 to the documents at issue in *Tax Analysts v. I.R.S.*, 117 F.3d 607 (D.C. Cir. 1977). In that case, the D.C. Circuit held that I.R.S. Field Service Advice Memoranda ("FSAs") could not be withheld pursuant to Exemption 5 because they "constitute agency law." *See id.* at 617. CREW's analogy must fail, however, because Document 3 is nothing like those FSAs, which were "issued by the Office of Chief Counsel for the IRS" as part of its function of "provid[ing] legal advice to the IRS, direct[ing] litigation in the Tax Court, and provid[ing] guidance and support for litigation in other courts." *Id.* at 608. Unlike the internal, informal NARA memo, FSAs are governed by a handbook instructing staff that each FSA should include "a statement of issues, a conclusions section, a statement of facts, and a legal analysis section," should "recommend a

position on each issue and state any limitations or conditions to which a conclusion may be subject," and should be written in a style that is "exploratory and descriptive so that the strengths and weaknesses of a case are presented and developed candidly." *Id.* at 609 (internal quotation marks omitted). In short, FSAs are standardized, formal analysis memoranda that contain a statement of the law being applied by the agency and are designed to "ensur[e] that field personnel apply the law correctly and uniformly." *Id.* As a consequence, FSAs are "held in high regard and are generally followed" (although they are not technically binding on IRS field personnel). *Id.*

Put simply, Document 3 – an unsigned, undated, one-page cover memorandum – bears no resemblance to the kind of memo at issue in *Tax Analysts*. CREW provides no basis for its assertion that Document 3, like the FSAs, represents "an attempt to develop a body of coherent interpretations of the records schedules of the White House visitor logs." Pls. Opp. at 9. Document 3 is not a statement of formal agency policy but is, instead, merely a "tool[] for *formulating* policy." *Tax Analysts v. I.R.S.*, 97 F. Supp. 2d 13, 17 (D.D.C. 2000) (holding that IRS "Legal Memoranda," unlike FSAs, may be withheld under the deliberative process privilege) (emphasis added).

CREW's challenges to the deliberative process rationale for withholding Documents 5 and 7 are similarly unavailing. CREW maintains that these documents "do not reflect a deliberative process at work" because they are "superior-to-subordinate" communications. *See* Pls. Opp. at 10 (citing *Evans v. U.S. Office of Pers. Mgmt.*, 276 F. Supp. 2d 34, 41 (D.D.C. 2003)). *Evans* cannot support the weight that plaintiff places upon it, however. That case did not hold that "superior-to-subordinate" communications are by definition not deliberative, as plaintiff's citation to that case implies. Indeed, *Evans* did not even concern a "superior-to-subordinate" communication at all. Instead, *Evans* simply held that the Office of General Counsel memoranda at issue in that case were not entitled to the presumption of predecisional character that attaches to communications from a

subordinate to a superior because those specific memoranda "moved 'horizontally' between agency components." *Evans*, 276 F. Supp. at 40.

Moreover, isolating these two e-mails from the rest of the deliberative documents concerning the pending WAVES schedule, so that their deliberative character may be attacked on the ground that they are "superior-to-subordinate" communications, is misleading. Plaintiff is not challenging documents 6 and 8-11, which reveal ongoing deliberations on the proposed schedules between NARA's General Counsel and other NARA employees. These other documents, described in the *Vaughn* Index, reveal that neither Document 5 nor Document 7 represents the end of the internal deliberations on the pending WAVES schedules. On the contrary, Document 6 continues the discussion from Document 5, and Document 8 continues the deliberations described in Document 7. Thus, the *Vaughn* Index clearly supports NARA's assertion that these communications were part of "an ongoing, inter-agency deliberative process connected with reaching a final decision on what was a formerly pending WAVES schedule." Stern Decl. ¶ 15; *see also id.* ¶ 11 (e-mail is "an especially candid medium used by attorneys and others" as part of NARA's deliberative processes, and that release of such e-mails "will have a negative impact on the ability of civil servants to have honest internal conversations essential to . . . decision-making").

In addition, CREW simply misstates the law when it asserts that NARA cannot withhold Documents 5 and 7 unless it establishes that it "has never implemented the opinions or analysis contained in these documents, has never incorporated them into final agency policy programs, never referred to them in a precedential fashion or otherwise treated them as if they constitute agency protocol." Pls. Opp. at 10 (citing *NLRB v. Sears, Roebuck, & Co.*, 421 U.S. 132, 151 (1975), and *Tax Analysts*, 117 F.3d at 617-18). That argument has been specifically rejected. In *American Civil Liberties Union v. Department of Justice*, 883 F. Supp. 399, 405 (S.D.N.Y. 1993), for example, the

court rejected plaintiff's contention that the government must "specify what policy was under consideration and affirm that the policy discussed has neither been adopted nor incorporated by reference." The court observed that this proposed standard "goes beyond the disclosure required by *Sears, Roebuck*." *Id.* "An exempt document does not become disclosable because the *policy* it discusses is ultimately adopted . . . . Rather, an exempt communication becomes disclosable if the *document itself* is adopted, formally or informally, as a statement of agency policy." *Id.* (internal citations omitted) (emphasis in original); *see also Access Reports v. Dep't of Justice*, 926 F.2d 1192, 1197 (D.C. Cir. 1991) (allegation that internal DOJ report should be disclosed because DOJ official allegedly referred to the report's conclusions when testifying before the Senate "fell far short of the *express* adoption required by *Sears*." (emphasis in original)).[4]

Recognizing such a heightened pleading standard would turn the deliberative process privilege on its head. If CREW's view of the law were accepted, then before an agency could withhold a deliberative communication, it would have to (1) give a detailed accounting of that communication, comparing it point-by-point to any final agency policy and, presumably, (2) release any communication that (in whole or part) accords with the final policy the agency adopts. NARA need not disclose the contents of its communications in this way before it can properly invoke the deliberative process privilege. Instead, it need only do what it has done here: identify the deliberative process of which the communication was a part (the discussions over proposed schedules for WAVES records) and the role the communications played in that process (the back-and-forth between agency personnel considering issues arising from the proposed, but later

---

[4] To the extent CREW is attempting to argue that NARA somehow adopted the analysis contained in Documents 3, 5, and 7, CREW – not NARA – bears the burden of proving that NARA has explicitly adopted the reasoning (and not merely the conclusion) of those Documents. *See infra* Part I.C.2 (discussing nonpublic OLC legal advice memorandum).

withdrawn, schedules).

Finally, CREW attacks the deliberative process rationale for withholding these documents by alleging that the failure to release them will result in public confusion. *See* Pls. Opp. at 10. CREW maintains that these documents must be released because there is "no documentation explaining what, if any, action NARA took with respect to the schedules." *Id.* This is not true. The schedules themselves, which were released pursuant to CREW's FOIA request, clearly document what action was taken: the schedules are marked "withdrawn."[5] Moreover, NARA's General Counsel explained in his initial declaration that these records were never scheduled: "In this case, the proposed schedules submitted in the 1990s were withdrawn." Stern Decl. ¶ 14. Hence, CREW cannot credibly allege confusion as to "what, if any, actions" NARA took with respect to these schedules. The only potential for confusion lies in the release of the withheld documents, which discuss issues surrounding a possible records schedule that was never approved. *See Judicial Watch, Inc. v. Clinton*, 880 F. Supp. 1, 13 (D.D.C. 1995) (release of deliberations concerning a decision or policy that "the agency ultimately elected not to issue" risks public confusion).

CREW also attacks NARA's withholding of these documents pursuant to the attorney work-product doctrine. As noted *supra*, CREW's arguments against applying the work-product doctrine to these materials are both factually and legally flawed. Because NARA could reasonably have anticipated litigation over the question of whether WAVES and related records were presidential or federal – in light of the fact that FOIA requests for these records had already been filed, *see* Huff Decl. ¶ 3; Supp. Stern Decl. ¶ 9 – CREW cannot argue that NARA's subjective belief that litigation

_____

[5] The schedule submitted on Feb. 22, 1990 (N1-87-90-2) was marked "withdrawn" on June 20, 1991. The schedule submitted on Mar. 28, 1996 (N1-087-93-03) – which is a revised version of (and is labeled with the same job number as) the schedule submitted on Feb. 9, 1993 – was marked "withdrawn" on Sept. 23, 2002.

might occur was unreasonable. *See* Stern Decl. ¶ 23. Moreover, CREW's contention that there might have been no litigation had the records been deemed to be federal, rather than presidential, *see* Pls. Opp. at 13, is beside the point; the fact that one possible outcome of a deliberation might pose less of a litigation risk does not mean that attorneys could not have reasonably anticipated litigation over the subject whose outcome they were debating.

    2.    *Deliberations on 2001 WAVES Retention Memorandum*

CREW next challenges NARA's withholding of documents deliberating a recommendation for the management of WAVES and related records and the transfer of certain Clinton Administration WAVES and related records from the USSS to the White House. Specifically, CREW challenges the withholding of Documents 12-14, 15, and 17, alleging that these documents are not deliberative because they represent "NARA's exercise of its statutory responsibility to act on records schedules agencies submit to the Archivist." Pls. Opp. at 14. As noted above, this argument misunderstands – and overstates – NARA's role in inter-agency deliberations about record retention issues. NARA is not the final arbiter of all record retention issues in the government. *See* Supp. Stern Decl. ¶ 7. Nor is it the decision maker with respect to what constitutes a presidential record. *See id.* ¶ 5; 44 U.S.C. § 2203.

Moreover, even by CREW's own description of NARA's duties, these documents do not constitute the "exercise" of NARA's "statutory authority." CREW argues that NARA's statutory obligation is to "act on records schedules agencies submit to the Archivist." Pls. Opp. at 14. But none of these documents (12-14, 15, or 17) are records schedules. Rather, these documents represent inter-agency deliberations about a specific set of recommendations for the management, transfer, and disposition of WAVES and ACR records. *See Vaughn* Index; Stern Decl. ¶ 18-19. NARA regularly participates in these types of inter-agency deliberations at the request of other agencies who are

exercising their statutory duty to create and maintain their own record keeping program. *See* Supp. Stern Decl. ¶ 6-7; 44 U.S.C. § 3102. Given NARA's expertise in dealing with the federal record keeping statutes – an expertise CREW repeatedly points out, *see* Pls. Opp. at 5-6, 11 – it is entirely appropriate for NARA to be involved in such inter-agency deliberations. If CREW were correct that any discussions with NARA on record keeping issues were by definition not deliberative, then other agencies would likely stop including NARA in their pre-decisional communications for fear that tentative or preliminary policy proposals shared with NARA would lose all protection under the deliberative process privilege.

Moreover, among this set of documents (12-14, 15, 17), the only one that represents NARA's response to another agency – *i.e.*, the only one that can even colorably be said to represent an "exercise" of what CREW believes to be NARA's statutory duty to "act on agency proposals regarding the disposition of its records" – is Document 14. But, for the reasons explained in the declarations of NARA's General Counsel, that document, too, is deliberative. Document 14 represents the General Counsel of NARA's response to recommendations made by the White House and the USSS.[6] Nothing said in this document about the status of WAVES records was binding or self-executing, as NARA had no authority to determine whether WAVES records fall under the PRA. *See* Stern Decl. ¶ 31; Supp. Stern Decl. ¶ 5; 44 U.S.C. § 2203(a); *Armstrong v. Bush*, 924 F.2d 282, 290 (D.C. Cir. 1991). Instead, in Document 14 NARA's General Counsel merely concurred

---

[6] The *Vaughn* Index and declaration make clear that Document 13 "consists of a set of *recommendations* . . . on how the USSS proposed to manage, transfer, and dispose of WAVES and ACR records." *Vaughn* Index # 13 (emphasis added). Therefore, CREW's contrary – and unsupported – assertion that this document was not created "to formulate a policy," *see* Pls. Opp. at 14, lacks merit. *See, e.g.*, *Coastal States Gas Corp.*, 617 F.2d at 866 (the category of "deliberative" documents protected by the privilege includes, *inter alia*, "recommendations, draft documents, proposals, [and] suggestions").

with certain recommendations and indicated an intent to work further with the USSS and White House on the management of WAVES and related records. *See* Supp. Stern Decl. ¶ 8. Importantly, those recommendations were never implemented in that form, as they were revisited during the current Administration – which began literally the day after NARA's General Counsel authored Document 14. *Id.* Ultimately, the position of the White House and USSS regarding WAVES and ACR records was memorialized in the aforementioned, public MOU. *Id.* Document 14 – along with the original set of deliberative recommendations that preceded it (Documents 12-13), and the inter- and intra-agency deliberations that followed it (Documents 15, 17) – was part of ongoing inter-agency deliberations about the conclusions ultimately articulated in the MOU. *Id.* As such, this document is pre-decisional and deliberative, and therefore is properly withheld pursuant to Exemption 5.

Disclosing Document 14 would run afoul of the principles underlying Exemption 5, because it would provide a window into inter-agency deliberations concerning WAVES records. If made public, Document 14's unexecuted recommendations could be compared to the position articulated in the MOU, thereby revealing substantive information about the confidential inter-agency deliberations. Preventing this type of window into ongoing deliberations is one of the core purposes of Exemption 5, which was intended to "protect[] the integrity of an agency's decision" by ensuring that "the public should not judge officials based on information they considered prior to their final decisions." *Judicial Watch*, 880 F. Supp. at 12; *see also Coastal States Gas Corp.*, 617 F.2d at 866 (the deliberative process privilege covers documents which would "inaccurately reflect or prematurely disclose the views of the agency"); *Badhwar v. U.S. Dep't of Air Force*, 622 F. Supp. 1364, 1370-71 (D.D.C. 1985) (noting that courts have applied deliberative process privilege where "[r]elease of the document would enable a comparison of the predecisional document with the final

decision it helped produce"), *affirmed in part, vacated in part on other grounds, and remanded*, 829 F.2d 182 (D.C. Cir. 1987).

Finally, plaintiff again argues that these documents are not entitled to work-product protection because NARA did not reasonably anticipate litigation on the legal status of WAVES records.  As explained *supra*, that argument is both legally and factually flawed, and should be rejected; attorneys at NARA and the other Executive Branch agencies involved in these deliberations reasonably expected litigation on the issues deliberated therein.

3.    *Deliberations on 2004 WAVES Retention Memorandum*

CREW similarly challenges NARA's withholding of deliberations concerning a set of recommendations made in 2004 for the disposition of WAVES and ACR records.  Again, CREW's arguments rest on a misunderstanding about NARA's role in inter-agency deliberations.  CREW alleges that "NARA's role in this process is mandated by the FRA, and is not . . . dependent on the desire of any particular agency to seek NARA's views on the disposition of agency records."  Pls. Opp. at 16.  This gets it exactly backwards.  NARA's participation in these deliberations resulted *precisely from* the "desire" of other Executive Branch entities – the Office of Counsel to the President and the USSS – to "seek NARA's views on the disposition of agency records."  One need look no further than the *Vaughn* Index, which describes Document 18 as a three-page, "unsigned draft memorandum . . . consisting of a set of recommendations . . . on how the USSS proposed to manage, transfer, and dispose of WAVES records."  *Vaughn* Index # 18; *see also* Stern Decl. ¶ 20 (Document 18 is a "draft document providing informal views on one way to address the disposition of WAVES records").  Nor was NARA's involvement in these inter-agency deliberations in any way unusual.  "NARA archivists and attorneys are routinely consulted by federal agencies for advice and recommendations in support of an agency's records management activities, and from time to time

we are also consulted by the White House in connection with providing best practices guidance on the management of presidential records." Supp. Stern. Decl. ¶ 6; *see also* Stern Decl. ¶ 14.

Again CREW relies upon *Tax Analysts* in arguing that NARA's deliberations on the informal proposal advanced by the USSS and the White House constitute a body of "secret law." *Id.* Again, as with Document 3, CREW attempts to describe an internal "draft document" from an unknown author as a statement of the official "legal views" of the agency. *See* Pls. Opp. at 15 (discussing Document 26). And, again, CREW's reliance on *Tax Analysts* is misplaced. NARA's intra- and inter-agency deliberative communications in response to the 2004 recommendation are just that: deliberative.[7] There is no indication from the *Vaughn* Index or the Stern declaration that these deliberative communications constitute NARA's final legal opinions. Moreover, as noted, it is the President, and not NARA, that determines whether a record is presidential. *See* Stern Decl. ¶ 31; Supp. Stern Decl. ¶ 5 (President determines whether a record meets 44 U.S.C. § 2201(2)'s definition of a presidential record). The President, or a federal agency, may wish to discuss record keeping issues with NARA, but that does not transform NARA's deliberative communications into anything like the SFAs at issue in *Tax Analysts*.

These communications are also protected by the work-product doctrine. CREW continues to argue that there was a "complete absence of any reasonable basis to anticipate litigation" and that even though litigation *did in fact occur* on this very question, it "did not occur until years later" and therefore "was not reasonably forseeable at the time of the documents' creation" in September 2004. As noted, this statement is misleading; the USSS did receive FOIA requests for White House access records prior to 2006. *See* Huff Decl. ¶ 3; Supp. Stern Decl. ¶ 9. It was therefore reasonable to

---

[7] CREW concedes as much with respect to the intra-agency communications; it abandons its challenge to the withholding of Documents 19-23, 25, and 28. *See* Pls. Opp. at 15 n.8.

believe that similar FOIA requests might result in litigation.

    4.  *USSS Presentation to NARA and Other Officials*

  CREW also challenges the withholding of Document 31, which contains part of a PowerPoint presentation given by USSS officials to attorneys and staff at NARA, Department of Justice, Office of Counsel to the President, and the WHORM. CREW argues that it is not deliberative because it contains "purely factual material." Pls. Opp. at 17. That argument ignores the *Vaughn* Index and Stern Declaration, which make clear that this document contained specific policy proposals concerning WAVES and related records management. *See Vaughn* Index # 31; Stern Decl. ¶ 21. As such, it was not "purely factual" but was, instead, part of ongoing inter-agency deliberations over the proper procedures for maintaining and transferring WAVES and related records. *See* Stern Decl. ¶ 21. Indeed, CREW concedes as much in the following paragraph when, in advancing yet another mistaken argument about NARA's "statutory authority to provide its input and legal conclusions," it plainly states that the presentation was "on an issue for which the Secret Service was seeking NARA's views." Pls. Opp. at 17. It is precisely because the presentation advanced proposals on which USSS was seeking input from attorneys and officials at NARA and other Executive Branch entities that it is protected by the deliberative process privilege.

  For the same reason, this document is also protected by the attorney work-product doctrine. It was prepared for, and presented to, lawyers and officials from NARA, Department of Justice, Office of Counsel to the President, and the WHORM, and sought their views on the legal status and maintenance of WAVES and related records. This is precisely the issue that NARA reasonably envisioned could (and did) become the subject of litigation. *See* Stern Decl. ¶ 23.[8]

---

[8] Although CREW continues to challenge the withholding of Documents 18a, 24, 27, 29, 30
(continued...)

### B.    Documents Related to the Pending *Judicial Watch* Litigation

CREW also challenges a number of documents contained in the second category identified by NARA – documents related to the then-pending *Judicial Watch* litigation.  CREW seeks access to a series of e-mail exchanges about the *Judicial Watch* lawsuit involving discussions among attorneys and officials at NARA, the USSS, the Department of Justice, and the Office of Counsel to the President.  These e-mails contain candid discussions of "pending issues with respect to the legal status of WAVES records," in light of the filing of the *Judicial Watch* lawsuit, *see Vaughn* Index 34, and, in some instances, the legal positions taken in litigation.  *See Vaughn* Index ## 34-37, 40, 42-44, 53; Stern Decl. ¶ 24.  As such, they are classic examples of deliberative communications and attorney work-product.  *See, e.g.*, *Coastal States Gas Corp.*, 617 F.2d at 868 (noting that memoranda "recommending legal strategy in light of a particular controversy" represented "a classic case of the deliberative process at work" (internal citation omitted)); *Judicial Watch, Inc. v. Dep't of Justice*, 432 F.3d 366, 370 (D.C. Cir. 2005) (holding that e-mails among Department of Justice attorneys discussing legal strategy are protected in their entirety by the work-product doctrine).

CREW's contrary arguments are unavailing.  First, CREW argues that these e-mails are not deliberative because "[NARA] has failed to identify exactly what decision it was participating in."  Pls. Opp. at 17-18.  This argument misunderstands the law.  An agency need not "point to an agency final decision" to invoke the privilege.  *Judicial Watch v. Export-Import Bank*, 108 F. Supp. 2d 19, 35 (D.D.C. 2000) (citing *Formaldehyde Inst. v. HHS*, 889 F.2d 1118, 1223 (D.C. Cir. 1989)).

---

(...continued)
– all of which fall into this first category of records concerning inter-agency deliberations on the disposition of WAVES records – CREW makes no argument in its brief about these documents.  In light of this absence of any contrary argument, this Court should award summary judgment to NARA with regard to these documents for the reasons set forth in Defendant's Motion for Summary Judgment and accompanying declaration and *Vaughn* Index

Rather, "[t]o establish that the document is pre-decisional," the agency need "merely establish what deliberative process is involved, and the role that the documents at issue played in that process." *Id.* NARA has demonstrated that, through these e-mail communications with attorneys and officials at the Department of Justice (the government attorneys handling the litigation), USSS, and Office of Counsel to the President, it was participating in candid discussions of the legal issues raised by a new case filed against the government. *See Vaughn* Index ## 34-37, 40, 42-44, 53; Stern Decl. ¶ 24. That is sufficient to invoke the protections of the deliberative process privilege.

CREW's other arguments with regard to these documents are red herrings. First, CREW argues that the legal status of WAVES records is no longer at issue in that *Judicial Watch* litigation. *See* Pls. Opp. at 18 (noting that "the only remaining dispute is whether the Secret Service produced all responsive documents"). What issues *remain* in that case is irrelevant to the assertion that government attorneys, at the outset of that litigation, candidly debated the legal issues that might arise, and positions that should be taken, in that litigation. Second, CREW notes that NARA was "not a party to the *Judicial Watch* litigation." *Id.* This too is irrelevant to whether these communications are protected by the deliberative process privilege and work-product doctrine. As CREW itself repeatedly notes, NARA has considerable expertise in the field of records management. Thus, it is entirely appropriate for NARA lawyers and staff to be included in inter-agency deliberations about the pending litigation against the government and the strategy to advance therein. This neither negates the deliberative nature of the communication, nor waives the work-product protection appropriately afforded to the writings of government lawyers developing the United States' litigation strategy. To maintain otherwise, as CREW does, is to ignore that many Executive Branch entities have overlapping expertise and interests which must be accommodated when defending litigation filed against the United States.

**C.      Deliberations on Status and Disposition of WAVES Records Contemporaneous With Ongoing Litigation**

CREW next challenges NARA's withholding of documents created contemporaneously with then-ongoing litigation seeking access to WAVES records, including (1) a draft of the MOU between the USSS and the WHORM, (2) a nonpublic legal advice memorandum issued by the Department of Justice's Office of Legal Counsel ("OLC"), along with a draft of that memorandum, and (3) e-mail communications regarding the drafting of the MOU and the nonpublic advice memorandum. All of these documents were properly withheld pursuant to Exemption 5.

*1.      Draft of the Memorandum of Understanding*

CREW claims that it is entitled to see a draft of the aforementioned MOU executed between the WHORM and the USSS (Document 45) because "NARA has not established that the opinions or analysis contained in the MOU were not incorporated into the final MOU that was made public." Pls. Opp. at 20.  CREW again relies on *NLRB v. Sears, Roebuck & Co.* for this proposition.  As discussed *supra*, *NLRB* cannot bear the weight that CREW places upon it, *see  ACLU v. Dep't of Justice*, 883 F. Supp. at 405, and to hold that it does would be to turn the deliberative process privilege on its head.  NARA need not establish that nothing in the draft MOU was incorporated into the final MOU to invoke the deliberative process privilege.  On the contrary, draft documents of this sort are routinely protected by the privilege because disclosing them would provide a window into the deliberations in which those documents were revised.  "[T]he disclosure of editorial judgments – for example, decisions to insert or delete material or to change a draft's focus or emphasis – would stifle the creative thinking and candid exchange of ideas necessary to produce good historical work." *Dudman Commc'ns Corp. v. Dep't of the Air Force*, 815 F.2d 1565, 1569 (D.C. Cir. 1987); *see also Russell*, 682 F.2d at 1048 (draft agency report is protected by the deliberative process privilege).

2.    *Nonpublic Advice Memorandum From DOJ's Office of Legal Counsel*

CREW also challenges the withholding of the nonpublic legal advice memorandum authored by OLC (Document 55). It alleges that neither the deliberative process nor attorney-client privilege, nor the attorney work-product doctrine, protects this document from disclosure. CREW is wrong with respect to each of these arguments.

First, this document is clearly shielded by the deliberative process privilege, which protects documents that are both "pre-decisional" – *i.e.*, documents that were "generated before the adoption of an agency policy" – and "deliberative" – *i.e.*, documents that "reflect[] the give-and-take of the consultative process." *Coastal States Gas Corp.*, 617 F.2d at 866. The nonpublic legal advice memorandum satisfies both of these requirements. It is pre-decisional because it was "prepared as part of the governmental deliberative process leading up to the execution of the [MOU]." Declaration of Steven G. Bradbury ("Bradbury Decl.") ¶ 5(a)). It is deliberative because "it is advice submitted for use by decisionmakers at various government entities involved in the decisions to prepare and execute the MOU." *Id.*

CREW attempts to negate the application of this privilege by arguing that the aforementioned MOU adopts the nonpublic OLC memorandum. It speculates that, "[g]iven OLC's advisory role, it is difficult to imagine that" the MOU "reflects a legal position inconsistent with that contained in the OLC advisory memo." Pls. Opp. at 21-22 (citing *Nat'l Council of La Raza v. Dep't of Justice*, 411 F.3d 350, 360 (2d Cir. 2005)). But mere speculation that the MOU agrees with the *conclusion* contained in the OLC memorandum is plainly insufficient to constitute adoption of that document:

> To be sure, had the Department simply adopted only the conclusions of the OLC Memorandum, the district court could not have required that the Memorandum be disclosed. Mere reliance on a document's conclusions does not necessarily involve reliance on a document's analysis; both will ordinarily be needed before a court may properly find adoption or incorporation by reference. . . . [T]here must be evidence

that an agency has *actually* adopted or incorporated by reference the document at issue; mere speculation will not suffice.

*Nat'l Council of La Raza*, 411 F.3d at 358-59 (emphasis in original).  Because the MOU makes no reference to the nonpublic OLC memorandum (*see* Bradbury Decl. ¶ 5(a)), it does not adopt the OLC memorandum, as would be required to strip it of the deliberative process privilege protection to which it is otherwise entitled.  *See Nat'l Council of La Raza v. U.S. Dep't of Justice*, 339 F. Supp. 2d 572, 581-82 (S.D.N.Y.2004) (holding that nonpublic OLC advice memorandum is deliberative); *Southam News v. INS*, 674 F.Supp. 881, 886 (D.D.C. 1987) (holding OLC opinion letter "discuss[ing] legal questions regarding the criteria used to evaluate visa applications made by a certain class of individuals" was protected by the deliberative process privilege (quotation marks omitted)); *see also Brinton v. Department of State*, 636 F.2d 600, 604 (D.C. Cir. 1980) (holding that legal advice memorandum from the Department of State Legal Adviser "fits exactly within the deliberative process rationale for Exemption 5"); *Int'l Paper Co. v. Fed. Power Comm'n*, 438 F.2d 1349, 1358-59 & n. 3 (2d Cir. 1971) (holding that legal advice memorandum from Federal Power Commission's General Counsel was shielded by the deliberative process privilege).

Second, CREW alleges that this document is not protected by the attorney-client privilege because "NARA has no attorney-client relationship with the Secret Service, the White House, or, most importantly, the OLC."  Pls. Opp. at 21.  This assertion is incorrect.  OLC does advise the Attorney General, the White House, and other entities within the Executive Branch on legal matters. *See* Bradbury Decl. ¶ 2-3.  This nonpublic advice memorandum perfectly illustrates OLC's role as legal adviser to the Executive Branch; the memorandum "constitutes confidential legal advice provided by OLC to Executive Branch entities, and reflects facts and information provided to OLC by those Executive Branch entities for purposes of preparing that legal advice."  *Id.* ¶ 5(b).

Moreover, consistent with OLC policy – except in those limited circumstances where OLC chooses to publish its memoranda after the passage of time – this memorandum has not been published, and in fact has been shared only with other Executive Branch entities.  *Id.* ¶ 4.

Third, CREW maintains that the nonpublic advice memorandum lacks protection under the work-product doctrine because NARA "does not even attempt to explain how there is an articulable claim NARA was involved in that would likely to lead to litigation involving NARA."  Pls. Opp. at 22.  This argument is sleight of hand.  CREW ignores the facts that OLC acts as a legal adviser to the entire Executive Branch, and that when OLC drafted this memorandum there *was litigation ongoing* against Executive Branch agencies – clients of OLC – seeking access to WAVES records under FOIA.  Bradbury Decl. ¶ 5(c).  Because this memorandum was written by OLC, in its capacity as legal adviser to the Executive Branch, and discussed legal questions then (and now) the subject of litigation, it is protected by the work-product doctrine.

Finally, in continuing to challenge the withholding of Document 45, CREW also seeks access to a preliminary draft of the OLC legal advice memorandum.  That draft is protected by the deliberative process and attorney-client privileges, and the attorney work-product doctrine, for all of the reasons noted above (in discussion of Document 55).  Moreover, it is further protected under the deliberative process privilege because the creation (and sharing) of that draft was part of the process of formulating legal advice, and because revealing this preliminary draft would impair OLC's ability to serve as an adviser to Executive Branch agencies.  *See* Bradbury Decl. ¶ 7; *Dudman Commc'ns Corp.*, 815 F.2d at 1569 (protecting draft documents under the deliberative process privilege); *Russell*, 682 F.2d at 1048 (same).

3.    *Inter- and Intra-Agency Communications About Drafts of the MOU and OLC Advice Memorandum*

CREW also seeks to obtain copies of the inter- and intra-agency communications relating to the drafting of the MOU and the OLC nonpublic advice memorandum.  Again, CREW falls back upon its two standard deliberative process arguments: contending (1) that communications from NARA about record keeping issues represent an exercise of NARA duties under the FRA, and (2) that any such statements represent NARA's official legal position, like the SFAs at issue in *Tax Analysts*.  *See* Pls. Opp. at 22.  As discussed at length *supra*, these arguments lack merit.  The FRA does not make NARA the final arbiter over all record keeping questions – including whether something is a presidential record – and informal, deliberative advice does not constitute a body of "secret law."  These types of back-and-forth e-mails are typical of, and essential to, the deliberative process by which draft documents such as the OLC memorandum and the MOU are considered.  *See, e.g.*, Bradbury Decl. ¶ 8-9 (Documents 45, 48, and 51 are e-mails that "relate to the preparation of OLC's nonpublic legal advice memorandum"); Stern Decl. ¶ 11 (e-mails, such as Document 46, are a medium in which government attorneys and staff candidly "render opinions, recommendations, or advice").

4.    *Inter-Agency Deliberations About the Transfer and Retention of WAVES and ACR Records in Light of Pending Litigation*

Finally, CREW seeks access to communications concerning the transfer and preservation of WAVES records during the pendency of litigation – including litigation in which CREW is a party.  *See* Pls. Opp. at 23.  Although CREW does not refer to these documents by number, they are identified as Documents 56-60 on the *Vaughn* Index.  CREW maintains that these are purely "factual" communications because they concern the "logistics" of maintaining WAVES records.  *See* Pls. Opp. at 23.  The record reveals the opposite, however: these e-mails are deliberative because

they show that an Associate Counsel to the President made a "request for agency recommendations and opinions" concerning the transfer and retention of documents during litigation, and that attorneys for NARA and the USSS responded with "opinions and recommendations of NARA and USSS staff." Stern Decl. ¶ 29. Moreover, these documents are protected by the work-product doctrine because they represent "deliberations on the logistics and handling of WAVES records, especially in light of pending litigation regarding access issues to such records," *id.*, and because they were sent from (and to) attorneys representing the government in that ongoing litigation.[9]

## II.    NARA CONDUCTED AN ADEQUATE SEARCH

As demonstrated by the declarations submitted by NARA's General Counsel – *see* Stern Decl. ¶ 5; Supp. Stern Decl. ¶ 10 – NARA "conducted a search 'reasonably calculated to uncover all relevant documents." *Weisberg v. Dep't of Justice*, 745 F.2d 1476, 1485 (D.C. Cir. 1984). CREW's allegations to the contrary represent nothing more than "speculative claims about the existence and discoverability of other documents," which are insufficient to overcome the "presumption of good faith" that attaches to NARA's declarations on the adequacy of its search. *Ground Saucer Watch v. CIA*, 692 F.2d 770, 771 (D.C. Cir. 1981). Moreover, these speculations are rebutted by NARA's General Counsel, who confirms that NARA searched all offices that "would likely be in possession of any responsive records." Supp. Stern Decl. ¶ 10.

---

[9] Plaintiff's claim that these descriptions of the documents do not provide sufficient "evidence . . . that the documents in fact contain legal discussion about legal obligations conducted by lawyers involved in the litigation," Pls. Opp. at 23, is plainly at odds with the record. As noted in text, these e-mails were sent from and to attorneys handling the litigation for the government – including attorneys from the Department of Justice, USSS, the Office of Counsel to the President, and NARA – and discuss document retention issues in light of that pending litigation.

# CONCLUSION

For all of the foregoing reasons, this Court should grant Defendant's Motion for Summary Judgment and deny Plaintiff's Cross Motion for Summary Judgment.[10]

June 21, 2007                                   Respectfully submitted,

                                               PETER D. KEISLER
                                               Assistant Attorney General

                                               CARL J. NICHOLS
                                               Deputy Assistant Attorney General

                                               JEFFERY A. TAYLOR
                                               United States Attorney

                                               ELIZABETH J. SHAPIRO (D.C. Bar 418925)
                                               Assistant Branch Director

**OF COUNSEL**:                                 **/s/ Michael P. Abate**
JASON R. BARON (D.C. Bar 366663)                JOHN R. TYLER (D.C. Bar 297713)
Director of Litigation                          Senior Trial Counsel
Office of the General Counsel                   MICHAEL P. ABATE (IL Bar 6285597)
National Archives and Records                   Trial Attorney, U.S. Department of Justice
Administration                                  Civil Division, Federal Programs Branch
8601 Adelphi Road, Suite 3110                   P.O. Box 883
College Park, MD 20740                          Washington, D.C. 20044
Telephone:    (301) 837-1499                    Telephone:    (202) 616-8209
Facsimile:    (301) 837-0293                    Facsimile:    (202) 616-8470
E-mail:       jason.baron@nara.gov              E-mail:       Michael.Abate@usdoj.gov
                                               *Delivery: 20 Massachusetts Ave., NW, Rm. 7302*

                                               *Attorneys for Defendant*

---

[10] Pursuant to LCvR 7(h), Plaintiff's Cross-Motion for Summary Judgment is accompanied by a Statement of Material Facts that sets forth the procedural history of its FOIA request. Because none of the allegations contained in that Statement are "material facts as to which . . . there exists a genuine issue necessary to be litigated" – *i.e.*, they will not "affect the outcome of the suit" challenging NARA's withholdings, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) – LCvR 7(h) requires no response. However, if this Court were to deem any of the allegations in the Statement material, Defendant refers the Court to its Answer, in which it responded to all of the allegations contained in Plaintiff's Rule 7(h) Statement (which are, in turn, drawn from -- and include citations to -- Plaintiff's Complaint).

**CERTIFICATE OF SERVICE**

I hereby certify that on the 21st day of June 2007, I caused the foregoing Defendant's Reply in Support of its Motion For Summary Judgment and Opposition to Plaintiff's Cross-Motion for Summary Judgment to be served on plaintiff's counsel of record electronically by means of the Court's ECF system.

/s/ Michael P. Abate

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civ. Action No. 07-0048 (RBW) |
| NATIONAL ARCHIVES AND RECORDS ADMINISTRATION, | ) ) ) | |
| Defendant. | ) ) | |

## SUPPLEMENTAL DECLARATION OF GARY M. STERN

I, Gary M. Stern, hereby declare:

1. In my original Declaration, dated May 7, 2007, I set out NARA's bases in support of withholding the documents listed on the *Vaughn* index under Exemption 5 of the Freedom of Information Act (FOIA), 5 U.S.C. 552(b)(5). I have read Plaintiff's Opposition to Defendant's Motion for Summary Judgment and Memorandum in Support of Plaintiff's Cross-Motion for Summary Judgment, and wish to respond to supplement the record by making the following additional points.

*NARA's Authority Under The Records Laws*

2. Congress has charged the Archivist of the United States ("Archivist"), and the National Archives and Records Administration ("NARA"), with several principal roles and responsibilities under the statutes collectively referred to as the Federal Records Act ("FRA").

Under Chapter 29 of Title 44, United States Code, NARA provides "guidance and assistance to

Federal agencies with respect to ensuring adequate and proper documentation of the policies and

transactions of the Federal Government and ensuring proper records disposition." 44 U.S.C.

§ 2904(a). NARA also "shall establish standards for the selective retention of records of

continuing value, and assist Federal agencies in applying the standards to records in their

custody." 44 U.S.C. § 2905(a). These standards are found in regulations issued by NARA in

chapter XII of Title 36, Code of Federal Regulations, in NARA bulletins issued to agency heads

and records officers, and in policy papers and directives circulated by NARA, including on its

website.

3. Under Chapter 33 of Title 44, United States Code, the Archivist of the United States is

also personally responsible for authorizing federal agencies to dispose of non-permanent federal

records. This authorization is established through the process of scheduling federal records. 44

U.S.C. § 3303a. NARA archivists and attorneys assist agencies during the deliberative process

of developing records schedules, but only the Archivist of the United States exercises the

authority under 44 U.S.C. § 3303a to give final approval to records schedules on the

government's behalf.

4. Under Chapter 31 of Title 44, United States Code, the head of each federal agency is

responsible for "mak[ing] and preserv[ing] records containing adequate and proper

documentation of the organization, functions, policies, decisions, procedures, and essential

transactions of the agency and designed to furnish the information necessary to protect the legal

and financial rights of the Government and of persons directly affected by the agency's

activities." 44 U.S.C. § 3101. The agency head is also responsible for establishing and maintaining "an active, continuing program for the economical and efficient management of the records of the agency." 44 U.S.C. § 3102. Such responsibilities necessarily entail determining whether or not particular materials meet the definition of what constitutes a federal "record," as set out in 44 U.S.C. § 3301. In turn, NARA is continually called upon to provide advice and recommendations on what constitute best practices in this area.

5. Under the separate provisions of the Presidential Records Act ("PRA"), Chapter 22 of Title 44, United States Code, the President is responsible for the records management of Presidential records, 44 U.S.C. § 2203(a), which includes determining whether or not particular records meet the definition of "presidential records" found in 44 U.S.C. § 2201(2). Although the President is required to seek the Archivist's views on any contemplated disposal of an incumbent Administration's presidential records, *see* 44 U.S.C. 2203(c), NARA has no formal role on the threshold question of whether particular documents or information do or do not constitute "presidential records" as defined under the PRA.

6. As I alluded to in ¶ 14 of my original Declaration, dated May 7, 2007, NARA archivists and attorneys are routinely consulted by federal agencies for advice and recommendations in support of an agency's records management activities, and from time to time we are also consulted by the White House in connection with providing best practices guidance on the management of presidential records. NARA considers all of these consultations part of the deliberative process for carrying out the government's overall records management responsibilities. NARA attorneys are also routinely consulted by the Department of Justice and

3

agency legal counsel when issues arise under the FRA, the PRA, or both.  In particular, the

advice, guidance, and recommendations that NARA's attorney staff (including myself) provide

also are very much part of the deliberative process for carrying out the government's records

management responsibilities, often at the intersection of law and policy.

7.  The 37 documents now remaining in this case reflect the ongoing deliberations on a

complicated and unusual records situation that has been of continuing interest to NARA over the

course of the last decade.  Contrary to what plaintiff represents throughout its Opposition and

Cross Motion brief, the communications contained in the withheld documents do not constitute

"legal conclusions" exercised under NARA's "statutory authority" as the "final arbiter" of

records disputes.  Other than the statutory responsibility the Archivist has to issue regulations

and to make a final decision on the permanent or temporary status of federal records in

accordance with 44 U.S.C. § 3303a, the Federal Records Act, as noted in ¶ 4, above, expressly

leaves to the head of each Federal agency the duty to establish and maintain records management

programs.  *Id.* § 3102.  Subordinate officials of NARA (including myself) simply attempt to

provide our best advice and recommendations with respect to how agencies should comply with

their responsibilities under the Act.  Thus, plaintiff's argument (at page 11 of their Brief and

elsewhere) incorrectly merges the Archivist's authority over the disposition of federal records

with NARA staff's general legal and policy advice-giving responsibilities.  The fact that there

has been a fair amount of intra- and inter-agency discussions involving NARA on the issues

surrounding the management of the copy of the White House access records in the possession of

the Secret Service – which under the MOU, the Secret Service will temporarily maintain until the

records are transferred to the White House Office of Records Management and then to NARA

for permanent preservation – is to be expected, as reflected in many of the documents singled out

by plaintiff in its Brief (including, but not limited to, documents 3, 5, 7, 12, 13, 17, and 26).

     8.  Plaintiff also specifically refers to document 14 as representing "NARA's discharge

of its statutory duty to act on agency proposals regarding the disposition of its records."

Document 14 consists of a memorandum I penned titled "Disposition of Certain Presidential

Records Created by the USSS," dated January 19, 2001 (the last day of the Clinton

Administration).  As I discussed in my prior Declaration at ¶ 18, this document, constituting a

one page "Memorandum" on NARA letterhead, reflected my then understanding of how

WAVES and related records would be treated under the records laws, and how NARA intended

to proceed in working in the future toward implementing the recommendations contained in

Document 13 coming from the White House and U.S. Secret Service.  Against the backdrop of

the change in Administration coming the day after I signed the memorandum, it turned out that

the recommendations contained in Document 13, which I concurred with in Document 14, were

not implemented in that form either by the Secret Service or by the Archivist of the United States

as the final decisionmaker for NARA.  Nor was Document 14 binding on anyone or self-

executing in any sense.  Rather, the entire matter of the status and handling of the copy of

WAVES and related records in the possession of the Secret Service was revisited during the

current Administration and, after a passage of time, the White House and the Secret Service in

2006 entered into the now-public Memorandum of Understanding setting forth the government's

official position.  I continue to believe that, in light of all of the surrounding developments that

have occurred with respect to WAVES and related records, this document should be considered

deliberative and pre-decisional when viewed in its proper context.

### Attorney Work-Product Doctrine

9.  CREW has challenged NARA's claim that the attorney work-product doctrine protects

documents dating back to March 2000, *see, e.g., Vaughn* Index # 5, and has alleged that NARA

failed to identify a single FOIA request for WAVES records prior to January 2006.  It was my

understanding in March 2000, based upon information made available to me in my capacity as

NARA General Counsel, that the Secret Service had previously received FOIA requests for

White House access records at that time.  It is my further understanding that the Secret Service

has received similar FOIA requests since that time period as well.

### Adequacy of NARA's Search for Responsive Records

10.  Plaintiff makes the additional argument that NARA has not carried its burden in

establishing that we conducted an adequate search for responsive records.  Specifically, plaintiff

has asked (at page 25 of their Opposition and Cross Motion) that NARA identify "which specific

files were searched using specific search terms."  NARA's FOIA search for responsive records

in this case was conducted in exactly the same manner as most FOIA requests are handled:  upon

receipt of the original request, our FOIA officer, Ramona Oliver, who works under my general

supervision, contacted the key agency offices and officials that were believed to have responsive

records and provided them with a copy of the request.  In this instance, it was quickly determined

that key staff in three offices would most likely be in possession of any responsive records:  the

General Counsel's office, the Office of Records Services—Washington, D.C., located in College

Park, Maryland, and the Office of Presidential Libraries, in Washington, D.C.  One or more key

individuals were tasked by the FOIA officer to review their paper and electronic files for any and

all responsive records related to the six categories set out in CREW's original FOIA request.

The search included records located in the official job files associated with Secret Service

records retention schedules, as well as in staff members' working papers found in each of the

above offices.  Individuals searched their own electronic mail accounts, as well as looked for

email that had been printed out and saved in files in accordance with NARA official policy.  To

the extent electronic searches were conducted in applicable email and word processing folders

and directories, there was no need to resort to specific "search terms," as each individual was

sufficiently familiar with the organization of his or her own directory structure so as to conduct

an exhaustive search.  During the administrative FOIA appeal, NARA staff in the Office of

General Counsel and the Office of Presidential Libraries recovered an additional 50 documents

from their working files.  Accordingly, we believe that the files on this discrete topic that are

likely to contain responsive records have been made subject to an adequate search.

    I declare under penalty of perjury that the foregoing is true and correct.

GARY M. STERN

Date:  June 21, 2007

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, )<br><br>Plaintiff, )<br><br>v. )<br><br>NATIONAL ARCHIVES AND RECORDS ADMINISTRATION, )<br><br>Defendant. ) | Civil Action No. 07-0048 (RBW) |

**DECLARATION OF STEVEN G. BRADBURY**

I, Steven G. Bradbury, declare as follows:

1.      I am the Principal Deputy Assistant Attorney General for the Office of Legal

Counsel ("OLC") of the United States Department of Justice (the "Department"). No one

currently holds the position of Assistant Attorney General for OLC. Consequently, in my

capacity as Principal Deputy Assistant Attorney General for OLC, I am the head of OLC and

supervise all OLC operations, including its response to requests under the Freedom of

Information Act ("FOIA"), 5 U.S.C. § 552. I submit this declaration in support of defendant's

motion for summary judgment in the above-captioned case. The statements made herein are

based on my personal knowledge and on information made available to me in the performance of

my official duties.

2.      The principal function of OLC is to assist the Attorney General in his role as legal

adviser to the President and to departments and agencies in the Executive Branch. In connection

with this function, OLC prepares memoranda addressing a wide range of legal questions

involving the operations of the Executive Branch. A significant portion of OLC's work can be divided into two categories. First, OLC renders opinions that resolve disputes within the Executive Branch on legal questions. Second, OLC performs a purely advisory role as legal counsel to the Attorney General, providing confidential legal advice both directly to the Attorney General and, through him or on his behalf, to the White House and other components of the Executive Branch. The nonpublic legal advice memorandum identified as part of Document 55 on the *Vaughn* Index was prepared by OLC in this advisory role, as were the draft of that memorandum identified as part of Documents 45 on the Index and the email communications identified as Documents 45, 48, and 51 on the Index.

3.    Although OLC's legal advice and analysis may inform the decisionmaking on policy matters, the legal advice is not itself dispositive as to any policy adopted by the Executive Branch. OLC itself does not purport, and in fact lacks authority, to make any policy decisions. OLC's role is to advise, not to mandate that its advice be implemented into agency policy.

4.    While the majority of OLC memoranda are treated as confidential, the Office has a limited publication project whereby after a lapse of years certain memoranda are reviewed and selected for publication. Memoranda are selected for publication only where the Department determines, in consultation with the agencies or offices with whom the memoranda were written, that disclosure is in the public interest. OLC has never made public the legal advice memorandum whose withholding is challenged by plaintiff (Document 55). To my knowledge, neither Document 55 nor the advice and analysis contained therein have been circulated or revealed outside the Executive Branch, but rather they have been shared only with government officials and staff working on these issues and closely held by them in strict confidence.

2

5.    Document 55 includes an eleven-page nonpublic legal advice memorandum dated May 11, 2006, and prepared by OLC. The memorandum contains legal advice regarding the status under the federal record-keeping statutes of records generated through the White House Access Control System ("WHACS").[1] This memorandum is exempt from mandatory public disclosure pursuant to Exemption Five of the Freedom of Information Act ("FOIA") because it is protected by the deliberative process privilege, the attorney-client privilege, and the attorney work-product doctrine.

(a)    The memorandum is protected by the deliberative process privilege because it is both pre-decisional and deliberative. It is pre-decisional because it was prepared as part of the governmental deliberative process leading up to the execution of the Memorandum of Understanding ("MOU") between the White House Office of Records Management ("WHORM") and the United States Secret Service ("USSS") addressing the status and handling of WHACS records. Representatives of the Executive Office of the President, the USSS, the National Archives and Records Administration ("NARA"), and the Department of Justice participated in that deliberative process. The memorandum is deliberative because it is advice submitted for use by decisionmakers at various government entities involved in the decisions to prepare and execute the MOU. Despite Plaintiff's assertions to the contrary, *see* Pls. Opp. at 21-22, this memorandum is purely advisory and retains its pre-decisional and deliberative character because, in executing the MOU, the WHORM and the USSS did not expressly adopt or incorporate

---

[1] The WHACS system includes two separate types of records: (1) records from the Workers and Visitors Entrance System ("WAVES") and (2) records from the Access Control Records System ("ACR").

by reference the OLC memorandum. Nor has it been adopted in any other way by any government entity. The memorandum is quintessentially deliberative because it is advice submitted for use by officials making governmental decisions.

(b)    The OLC memorandum is also protected by the attorney-client privilege because it constitutes confidential legal advice provided by OLC to Executive Branch entities, and reflects facts and information provided to OLC by those Executive Branch entities for purposes of preparing that legal advice.

(c)    Finally, the OLC memorandum is also protected by the attorney work-product doctrine because litigation was foreseeable over the status of WHACS records under the federal record-keeping statutes. Indeed, at the time the memorandum was written, lawsuits had already been filed against the USSS seeking access to WHACS records under FOIA.

6.    Compelled disclosure of this advisory and pre-decisional document would cause serious harm to the deliberative processes of the Department of Justice and the Executive Branch and would disrupt the attorney-client relationship between the Department and the President and other officers of the Executive Branch. Attorneys in OLC are often asked to provide advice and analysis with respect to very difficult and unsettled issues of law. Frequently, such issues arise in connection with highly complex and sensitive operations of the Executive Branch. It is essential to the mission of the Executive Branch that OLC legal advice, and the development of that advice, not be inhibited by concerns about public disclosure. Protecting the confidentiality of OLC legal advice memoranda is essential in order both to ensure that creative and even controversial legal arguments and theories may be examined candidly, effectively, and in writing

4

and to ensure that Executive Branch officials will continue to request legal advice from OLC on such sensitive matters.

7.      Document 45 on the *Vaughn* Index includes a draft of the OLC advice memorandum contained in Document 55. The rationale supporting the application of the various privileges to the final version of the memorandum (*see* ¶¶ 5-6, *supra*) applies fully to the draft. Moreover, an additional rationale supports application of the deliberative process privilege to the draft. Creating such a draft document is an integral part of legal deliberations within OLC, the Department, and the Executive Branch. Through the writing process, OLC attorneys focus, articulate, and refine their advice and analysis. Drafts do not represent the final position or ultimate views of the Office, the Department, or the Executive Branch. To the contrary, drafts are, by their very nature, pre-decisional and deliberative. They are part of the exchange of ideas and suggestions that accompanies all decisionmaking, and they reflect the preliminary assessments and suggestions of OLC attorneys. Indeed, as a matter of Office policy, OLC attorneys exchange draft documents with one another for comments, edits, and suggestions. Inevitably, initial drafts of documents differ substantially from the final versions, as attorneys adjust their analysis in response to input from their colleagues. Comparing the final copy of a document against the prior drafts would, inevitably, reveal changes and revisions made by OLC and the Department during the deliberative process.

8.      Finally, disclosure of the withheld e-mail communications concerning preparation of the OLC memorandum among OLC attorneys and White House, USSS, or NARA attorneys (Documents 45, 48, 51) would undermine the deliberative processes of OLC and the Executive Branch. OLC attorneys routinely send e-mails to other Executive Branch attorneys which convey

preliminary advice, analysis, and reactions to legal issues. OLC attorneys use e-mail to solicit

comments and information from Executive Branch entities about a legal issue and to engage

attorneys from other Executive Branch entities in "back and forth" discussions about an issue,

just as they might in a face-to-face meeting or telephone conversation. OLC e-mails, in essence,

reflect a fluid and evolving exchange of ideas.

 9. The e-mails withheld in this case are characteristic of OLC e-mail use. All of the

messages relate to the preparation of OLC's nonpublic legal advice memorandum regarding the

status of WHACS records under the federal record-keeping statutes (Document 55), and all of the

messages either seek or contain edits, comments, or suggestions on drafts of the legal advice

memorandum; in addition, one of the messages (Document 45) attaches a draft of the

memorandum. Requiring the production of these quintessentially deliberative and preliminary

documents would impair decisionmaking by discouraging OLC attorneys from candidly and

freely exchanging information and ideas with their Department of Justice colleagues and other

Executive Branch attorneys while examining complicated legal issues and preparing legal advice.

 I declare under penalty of perjury that the foregoing is true and correct.

Executed: June **21**, 2007

STEVEN G. BRADBURY

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | ) ) ) | |
| Plaintiff, | ) ) ) | CIVIL ACTION NO. 07-0048 (RBW) |
| v. | ) ) ) | |
| NATIONAL ARCHIVES AND RECORDS ADMINISTRATION, | ) ) ) | |
| Defendant. | ) ) | |

### DECLARATION OF LATITA M. HUFF
### DISCLOSURE OFFICER
### FREEDOM OF INFORMATION AND PRIVACY ACTS PROGRAM
### LIAISON DIVISION
### UNITED STATES SECRET SERVICE

I, Latita M. Huff, hereby make the following declaration:

1.    I am the Disclosure Officer, GS-15, of the Freedom of Information and Privacy Acts (FOI/PA) Program, Liaison Division, for the United States Secret Service (hereinafter "Secret Service"), which is a component of the Department of Homeland Security ("DHS"). I have been the Secret Service Disclosure Officer since December 29, 2002, and previously was assigned as the Branch Chief of the FOI/PA Branch (now Program), since December 6, 1998. I have been employed with the Secret Service since July 6, 1987, and have been assigned to the FOI/PA Branch/Program since that time.

2.    As the Secret Service's Disclosure Officer, I receive and review FOIA requests that are submitted to the Secret Service, and oversee processing of these requests.

3.      In connection with the above-captioned litigation, I have been asked to provide

information regarding FOIA requests for White House access records received by the Secret

Service.  The records of the FOIA office reflect that, as of March 2000, the Secret Service had

received multiple FOIA requests for White House access records.  Moreover, for the time period

from March 2000 to the present, the records of the FOIA office reflect that the Secret Service

intermittently received FOIA requests for White House access records.

I declare under penalty of perjury that the foregoing is true and correct.

_June 21, 2007_
Date

_Latita M. Huff_
Latita M. Huff
Disclosure Officer

2